UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GABRIELLE ZAM,<br><br>                              Plaintiff,<br><br>                    -against-<br><br>MIZUHO AMERICAS SERVICES LLC, et al.,<br><br>                              Defendants. | 24-CV-2537 (JGLC)<br><br>**<u>OPINION AND ORDER</u>** |

JESSICA G. L. CLARKE, United States District Judge:

Plaintiff Gabrielle Zam ("Plaintiff" or "Zam") brings this action against Mizuho

Americas Services, LLC ("Mizuho" or the "Company") and Defendants Cheryl Benoit and

Steven Gatto (the "Individual Defendants," and together with Mizuho, "Defendants") alleging

disability discrimination and unlawful retaliation. Plaintiff is a policy strategist with experience

in financial services and holds a degree from the University of Pennsylvania Carey Law School.

In 2018, Plaintiff was diagnosed with tongue cancer and underwent treatment and operations,

including the partial removal of her tongue. As a result of the surgery, Plaintiff faces certain

challenges. For example, she has difficulty speaking clearly and projecting her voice. She also

experiences dry mouth and is required to frequently rinse her mouth.

Plaintiff began working remotely at Mizuho during the pandemic and had a positive start

to her time there by getting assigned substantive and meaningful projects and receiving

compliments on her work. By the fall of 2022, Mizuho updated its policies to require employees

to return to the office absent an approved accommodation. Plaintiff's oncologist recommended

she get an accommodation to prepare herself to work in person, and Plaintiff made her

accommodation request in August 2022 shortly after the policy was announced. After making the

request, Plaintiff found herself in situations where members of Mizuho's management appeared

to publicly single out her accommodation, such as skeptically reminding her that any accommodation needed to be for her, not a family member. Her new supervisor, who knew about her accommodation and need for it, also criticized Plaintiff in a performance review for conduct related to her disability, including not speaking loudly or clearly enough. The following day, Plaintiff spoke to her department head, informing him that she felt attacked because of her disability and accommodation by the performance review. No action was taken nor was any investigation conducted.

Plaintiff continued to work remotely, but a few months later, Plaintiff requested FMLA leave to take care of her son (who has epilepsy and autism) and husband (who had recently been diagnosed with lymphoma). Plaintiff was terminated only days after that request without notice or explanation.

Before the Court is Defendants' partial motion to dismiss Plaintiff's Second Amended Complaint. As set forth below, Plaintiff has plausibly stated a claim for disability discrimination because she has alleged sufficient conduct and remarks by Defendant Benoit, the individual who fired her, that could give rise to an inference of discrimination at the pleading stage. Plaintiff also states a claim for disability discrimination based on a failure to accommodate given that she alleges Defendant Benoit failed to renew her requested accommodation, and alleges that working from home was necessary to enable her to perform essential responsibilities of her position. However, Plaintiff's FMLA retaliation claim against Defendant Gatto fails because she does not plausibly allege that Gatto had any involvement in, knowledge of, or control over her FMLA leave request.

Accordingly, the Court GRANTS Defendants' motion in part and DENIES it in part, and DENIES Plaintiff's request for leave to file a third amended complaint.

## BACKGROUND

The following facts are, unless otherwise noted, taken from the Second Amended Complaint and presumed to be true for the purposes of the instant motion. *See LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).

Plaintiff is a policy strategist with decades of experience in financial services and holds a degree from the University of Pennsylvania Carey Law School. ECF No. 25 ("SAC") ¶¶ 17–18. Plaintiff's career has largely consisted of roles in the financial services industry, including roles in compliance and risk management. *Id.* ¶¶ 20–22. In 2018, Plaintiff was diagnosed with tongue cancer, and underwent treatment and operations, including the partial removal of her tongue. *Id.* ¶ 24. The diagnosis presents a myriad of issues for Plaintiff: for instance, Plaintiff struggles to project her voice and speak clearly, and must constantly ensure her mouth does not get too dry. *Id.* ¶¶ 26–30. Plaintiff also has a child with epilepsy and autism who requires around the clock care. *Id.* ¶ 31. Plaintiff's husband was diagnosed with lymphoma in 2023 and required daily treatment for a period of several months. *Id.* ¶¶ 32, 33.

In May of 2020 during the COVID-19 pandemic, Plaintiff began working remotely at Mizuho as a Director on the Americas Risk Management team. *Id.* ¶ 34. After a year, Mizuho did internal restructuring and Plaintiff joined the Operational Risk Management Planning Team, which broadened her responsibilities. *Id.* ¶ 37. Plaintiff received positive feedback on her work. For example, in spring 2021, Plaintiff received a performance review by Enrique Landaeta (Executive Director, Credit Risk Officer, Enterprise Corporate Credit Risk), which included a $40,000 bonus. *Id.* ¶¶ 39, 40. After Plaintiff drafted a policy document, Tim Healey, (U.S. Chief Risk Officer ("CRO")) told Plaintiff she had done "great work." *Id.* ¶ 44. During Plaintiff's April 24, 2022 performance review, Plaintiff's then-manager James Stachnik (Executive Director,

Operational Risk) told her that CRO Healey saw she had a unique skill set and that he wanted Plaintiff to step into a "policy guru" role as a subject matter expert at the Company. *Id.* ¶¶ 44, 46. In July 2022, Plaintiff met with her managers and CRO Healey to review and agree upon the "policy guru" role expansion. *Id.* ¶ 51.

In the summer of 2022, Mizuho announced it was removing its COVID-19 protocols after Labor Day, but would permit employees to request that the Company make exceptions. *Id.* ¶¶ 52, 53. The requests for remote work exceptions were mostly COVID-related at that time. *Id.* ¶ 57. Plaintiff's oncologist recommended she continue to work remotely to prepare for an adjustment to working in person—namely, preparing for long conversations and not having to contend with background noise. *Id.* ¶ 54. Thereafter, on August 11, 2022, Plaintiff submitted the essential paperwork to both Mizuho and Unum, the third-party providing disability services, to seek an accommodation. *Id.* ¶¶ 55–56. Mizuho learned of Plaintiff's disability through her submissions to Unum, and it eventually approved the accommodation in early October 2022. *Id.* ¶¶ 56, 57. CRO Healey would have been the person approving work from home accommodations at that time. *Id.* ¶ 57.

Though Plaintiff was diligent and productive while working from home, *id.* ¶¶ 65–68, after submitting her accommodation request in August 2022, Plaintiff received choice comments from Mizuho management. *Id.* ¶ 58. For example, in September 2022 Plaintiff was on a group call led by Defendant Steven Gatto (Head of Operational Risk Management). Defendant Gatto publicly singled out Plaintiff, saying that Stachnik had mentioned she "put[] in for an exception." *Id.* ¶ 60. Defendant Gatto appeared to doubt the authenticity of Plaintiff's accommodation request, telling her on the group call that the accommodation "has to be for [Plaintiff]" and can't

be "to take care of someone else." *Id.* ¶ 61. Plaintiff never heard of any other Mizuho employee that had their accommodation request announced and questioned in a similar fashion. *Id.* ¶ 62.

In September 2022, Plaintiff attended a lunch with several individuals, including CRO Healey. CRO Healey remarked "I hope you didn't come in just for this" and became aware of Plaintiff's disability for the first time at the lunch. *Id.* ¶¶ 69–75. In November 2022, at a work-sponsored lunch, Plaintiff sat close to Defendant Gatto, who asked, in front of everyone at the table, if Plaintiff had come in "just for this" and when Plaintiff confirmed she had, Defendant Gatto stated "glad you're okay to come for lunch." *Id.* ¶¶ 76, 79. Defendant Gatto once again asked her, in earshot of others at the table, if she requested the accommodation to take care of someone else. *Id.* ¶ 82. Defendant Gatto also then gestured to the far end of the table where Defendant Benoit was sitting, commenting that Benoit "didn't want to come in" because she lives in New Jersey and that her reward was that she got to be in charge of the "icebreakers." *Id.* ¶ 83.

Plaintiff continued to receive comments about her accommodation. In December 2022, the Operational Risk team had a holiday potluck lunch, and Plaintiff again attended because of her concern about being absent. *Id.* ¶ 91. When Plaintiff arrived, Defendant Gatto asked if Plaintiff "came in just for" the lunch. *Id.* ¶ 92. Defendant Benoit repeated the same question when Plaintiff sat down, and after remarking Plaintiff sounded sick, Plaintiff explained her prior surgery and how it affected her vocal cords. *Id.* ¶¶ 93–94. Defendant Benoit responded that she hoped Plaintiff sued the doctors responsible. *Id.* ¶ 95.

In December 2022, Stachnick resigned, and Plaintiff had a new role which involved her reporting to Defendant Cheryl Benoit. *Id.* ¶¶ 87–90. The role required Plaintiff to take on more responsibilities and work longer hours. *Id.* ¶¶ 100–104. By January 2023, Plaintiff's WFH

accommodation required renewal, and Defendant Benoit was responsible for that reapproval. *Id.* ¶¶ 107, 108.

Beginning around that time, Defendant Benoit began to scrutinize Plaintiff's productivity by, for example, asking for details on what Plaintiff worked on when she claimed to be working late and over the weekends. *Id.* ¶¶ 109–11. Leading up to March 2023, when Plaintiff would require another accommodation renewal, Defendant Benoit asked Plaintiff, in a "disparaging tone," if she intended to extend her accommodation indefinitely. *Id.* ¶ 116.

On April 27, 2023, Defendant Benoit scheduled Plaintiff's 2022 review, without prior notice, for that same day. *Id.* ¶ 119. Defendant Benoit's comments focused only on Plaintiff's work from the time she became Plaintiff's manager. *Id.* ¶ 121. Among other things, Defendant Benoit told Plaintiff she needed to speak more clearly and loudly on calls. *Id.* ¶¶ 123, 124. Benoit made this comment even though Plaintiff had previously told Benoit about her limitations due to her diagnosis. *Id.* ¶ 125. Defendant Benoit also relayed to Plaintiff that Benoit had informed other department heads that another employee was overwhelmed with the policy work they were doing for Plaintiff. *Id.* ¶ 126. Plaintiff did not receive a formal copy of the April 2023 review, which is Mizuho's standard practice. *Id.* ¶ 131.

The following day, on April 28, 2023, Plaintiff met with Defendant Gatto and told him that she felt targeted by Defendant Benoit regarding her disability and accommodations and wanted another manager. *Id.* ¶ 138. Defendant Gatto denied Plaintiff's request but assured her that her job was not at risk. *Id.* ¶ 141. Defendant Gatto did not report the conversation to HR, but he did inform Defendant Benoit about Plaintiff's request for a new manager *Id.* ¶¶ 142, 143.

Thereafter, Plaintiff continued to have encounters with Defendant Benoit. For instance, Defendant Benoit would ask questions like "[w]hat do you do" and challenge the need for

Plaintiff to speak to CRO Healey. *Id.* ¶¶ 149, 152. Defendant Benoit also expressed skepticism at Plaintiff's claimed assignments, telling her she would check with the person Plaintiff said she received work from in order to confirm Plaintiff's assignments. *Id.* ¶ 156. Still, Plaintiff continued to receive substantive work and compliments on the quality of her work. *Id.* ¶¶ 162–66. She also continued to work diligently on assignments, including on days she was supposed to be on vacation. *Id.* ¶ 173–175.

By July 2023, Plaintiff's accommodation again came up for renewal, but Defendant Benoit did not approve it. *Id.* ¶¶ 167–69. Unum told her that her accommodation file would be placed in "inactive status." *Id.* ¶ 169. Thereafter, Plaintiff continued to experience negative interactions with Defendant Benoit. For instance, on September 11, 2023, Plaintiff went into the office to discuss Board Risk Committee ("BRC") documents with Defendant Benoit. *Id.* ¶¶ 181, 185. While there, she received praise from multiple colleagues on her work, and Defendant Benoit, who appeared irritated, told Plaintiff she "better leave now and get back home, it's going to be a long night of work." *Id.* ¶¶ 186–87. Defendant Benoit then forwarded an August 2023 email from the legal team indicating a September 15, 2023 deadline for the BRC documents. *Id.* ¶ 188. In working on these documents, on September 12, 2023, Plaintiff identified a potential issue and suggested to Defendant Benoit that the drafts be updated. *Id.* ¶¶ 191–92. Defendant Benoit, in a call, yelled at Plaintiff to put the BRC documents through as they were, and later hung up. *Id.* ¶¶ 194–96.

In August 2023, Mizuho sent out a firmwide email to all employees as a reminder about WFH policies, including having a photo visible on emails and being on camera during Zoom calls. *Id.* ¶ 197. Defendant Benoit forwarded the email to the Risk team email group and added

Plaintiff individually to the email as well (though she was already on the team email group list). *Id.* ¶ 198.

In September 2023, Plaintiff's husband was diagnosed with lymphoma, and her son's caretaker could no longer to commit to looking after him. *Id.* ¶¶ 211, 212. Accordingly, on September 28, 2023, Plaintiff submitted a request to a Human Resources associate for immediate leave under the Family Medical Leave Act ("FMLA"). *Id.* ¶ 213. Plaintiff also emailed Defendant Benoit about her request. *Id.* ¶ 214. Plaintiff confirmed her first day of FMLA was September 29, 2023, and submitted the requisite materials to Unum. *Id.* ¶¶ 219–20. On October 6, 2023, Florencia Luccioni, the Human Resources Director, called Plaintiff, and then connected Defendant Benoit to the call, who then terminated Plaintiff's employment without any notice. *Id.* ¶¶ 222, 223. As of May 2024, Mizuho published job postings for a role that appeared identical to the one Plaintiff performed. *Id.* ¶ 227 & n.1.

On April 3, 2024, Plaintiff filed this action alleging retaliation and disability discrimination pursuant to the FMLA, New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). ECF No. 1. Plaintiff timely filed a charge of discrimination with the United States Equal Opportunity Commission (the "EEOC") alleging violations of the Americans with Disabilities Act of 1990 (the "ADA"). SAC ¶ 8. Plaintiff received a Right to Sue letter on May 10, 2024. On May 31, 2024, Plaintiff filed her first amended complaint to add a claim for violations of the ADA. ECF No. 18. Defendants moved to dismiss the amended complaint on July 1, 2024. ECF No. 19. Plaintiff filed the operative second amended complaint on July 22, 2024, asserting generally the same claims. ECF No. 25. On August 23, 2024, Defendants filed the instant motion seeking partial dismissal of Plaintiff's second amended complaint. ECF Nos. 31, 33 ("Mem.").

**LEGAL STANDARD**

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (internal citation omitted). A claim will survive a Rule 12(b)(6) motion only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678. If a complaint does not state a plausible claim for relief, it must be dismissed. *Id*. at 679.

**DISCUSSION**

The Court first determines that Plaintiff fails to state a claim for FMLA retaliation against Defendant Gatto because she has not alleged facts showing Gatto had any involvement in, or control over, her termination. Second, the Court concludes that Plaintiff has stated a claim for disability discrimination because she has met her minimal burden to allege facts that support an inference of discriminatory treatment. The Court then holds that Plaintiff also plausibly states a failure to accommodate discrimination claim because she alleges that her requested accommodation to work remotely, which was not approved shortly before she was terminated, was necessary to allow her to perform essential job functions. Finally, the Court denies any

request for leave to amend the claims because Plaintiff has already been given ample opportunity to address the deficiencies with her claims.

## I. Plaintiff Has Failed to State a Claim for Retaliation under the FMLA as to Individual Defendant Gatto

Plaintiff argues that Defendants unlawfully retaliated against her because they "terminat[ed] her employment within days of her request to take legitimate FMLA-eligible leave." SAC ¶ 229. Defendants seek dismissal on this claim with respect to Defendant Gatto only, arguing that the SAC has failed to allege facts sufficient to show that he had any involvement in, or knowledge of, Plaintiff's FMLA request or her termination. Mem. at 20–23. The Court agrees.

Where, as here, a plaintiff seeks to maintain an FMLA claim against an individual employee, the question is whether those individuals acted as "employers" within the meaning of the FMLA. *Ziccarelli v. NYU Hosps. Ctr*, No. 15-CV-9307, 2021 WL 797668, at *8 (S.D.N.Y. Feb. 27, 2021). This term is defined as encompassing "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(I). Whether an individual is an "employer" for the purposes of the FMLA is determined by the "economic reality test," which the Second Circuit adopted in *Graziadio v. Culinary Institute of America*, 817 F.3d 415 (2d Cir. 2016). "Under this test, courts ask whether the alleged employer possessed the power to control the worker in question, with an eye to the 'economic reality' presented by the facts of each case." *Graziadio*, 817 F.3d at 422 (cleaned up) (*quoting Herman v. RSR Sec. Servs. Ltd*., 172 F.3d 132, 139 (2d Cir. 1999)). This inquiry involves the consideration of a series of nonexclusive and overlapping factors, including whether the alleged individual "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and

method of payment, and (4) maintained employment records." *Id.* at 422 (internal citation omitted). In addition, the individual must be "responsible in whole or in part for the alleged violation [of the FMLA] while acting in the employer's interest." *Mitura v. Finco Servs., Inc.*, 712 F. Supp. 3d 442, 457 (2024) (quoting *Noia v. Orthopedic Asscos of Long Island*, 93 F. Supp. 3d 13, 17 (E.D.N.Y. 2015).

Plaintiff has not alleged facts sufficient to suggest that Defendant Gatto had any involvement in, or control over, Plaintiff's ability to receive and exercise her FMLA benefits. Plaintiff does not allege, for instance, that Defendant Gatto knew about Plaintiff's request for FMLA leave, or that Gatto played any role in her termination. Indeed, Plaintiff does not discuss Defendant Gatto *at all* with respect to the FMLA leave request and her subsequent termination. The SAC therefore does not raise an inference that Defendant Gatto "controlled in whole or in part" Plaintiff's rights under the FMLA. *Graziadio*, 817 F.3d at 423 (2d Cir. 2016) (quoting *Noia*, 93 F. Supp. 3d at 16).

Still, Plaintiff would have the Court assume that Defendant Gatto knew of her requested FMLA leave because, she alleges, Defendant Gatto supervised her, and because of the nature of corporate "chain of command," ECF No. 34 ("Opp.") at 17, Benoit would have "[u]ndoubtedly" informed Defendant Gatto of her FMLA request. SAC ¶ 214. The Court need not accept this conclusory assertion which is belied by the rest of Plaintiff's complaint. For instance, Plaintiff only emailed Defendant Benoit and Arati Pillai about her FMLA leave, not Gatto. SAC ¶ 214. And the SAC does not allege any interaction between Plaintiff and Defendant Gatto *at all* following their April 2023 conversation. Moreover, even if Defendant Gatto's knowledge of the FMLA request could be assumed, it would not automatically establish any control or involvement by him with respect to Plaintiff's termination.

In short, because Plaintiff "has not alleged that [Gatto] took specific actions to deny her benefits to which she was entitled under the FMLA," her retaliation claim against him is dismissed with prejudice as against Defendant Gatto. *Ziccarelli*, 247 F. Supp. 3d at 447.

## II. Plaintiff Has Stated a Discrimination Claim Under the ADA, NYSHRL, and NYCHRL

Plaintiff alleges that Defendants discriminated against her because of her disability in violation of the ADA, NYSHRL, and NYCHRL by "coercing Ms. Zam into disclosing her disability, denying her request for accommodation, by singling Ms. Zam out in front of her peers for having a disability, and by terminating her employment." SAC ¶¶ 233, 238, 243. Defendants seek dismissal arguing (1) Plaintiff has not alleged that any similarly situated Mizuho employee received more preferential treatment; and (2) that none of the alleged comments and acts by Defendants are sufficient to give rise to discriminatory intent or animus. Mem. at 6–15. As set forth below, the Court analyzes the federal and state law claims separately and determines that Plaintiff has plausibly stated a claim for disability discrimination under all statutes.

### A. Plaintiff Has Stated a Claim for Disability Discrimination Under the ADA against Mizuho

To plead disability discrimination under the ADA, a plaintiff must show that (1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA or perceived to be so by her employer; (3) she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (4) she suffered an adverse employment action; and (5) the adverse action was imposed because of her disability. *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d. Cir. 2015). Although a plaintiff need not specifically plead each and every element of a prima facie case of discrimination to survive a motion to dismiss, Zam must still provide "at least minimal support for the proposition that [Mizuho] was motivated by discriminatory intent" in terminating her employment. *Pustilnik v.*

*Battery Park City Auth.*, No. 18-CV-9446 (RA), 2019 WL 6498711, at *7 (S.D.N.Y. Dec. 3, 2019) (citing *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)). Still, it is a low burden, and the Second Circuit has "cautioned district courts against imposing too high a burden on plaintiffs alleging discrimination at the 12(b)(6) stage." *Doe v. Columbia Univ.*, 831 F.3d 46, 55 n.8 (2d Cir. 2016).

Plaintiff has alleged, and Defendants do not contest, that Mizuho is subject to the ADA, and that Plaintiff has a qualifying disability, had adequate qualifications for her job at Mizuho, and that she suffered an adverse employment action with respect to her termination. Accordingly, the only remaining question is whether Plaintiff's allegations regarding Benoit and Gatto's actions raise an inference of discriminatory intent surrounding her termination from Mizuho. The Court considers the actions of each Benoit and Gatto in turn.

Plaintiff has alleged the following incidents with respect to Defendant Benoit: (i) at the December 2022 lunch, Benoit asked Plaintiff "did you come in just for this?" (SAC ¶¶ 91, 93) and told Plaintiff she hoped Plaintiff sued the doctors who botched her surgery (*id.* at ¶¶ 94–95); (ii) in March 2023, Benoit asked, in a "disparaging" tone, if Plaintiff intended to extend her accommodation indefinitely (*id.* at ¶ 116); (iii) during Plaintiff's April 2023 performance review, Benoit criticized Plaintiff, telling her she needed to speak more loudly and clearly on calls with the Credit Risk Operating Committee calls and at redlined page turn sessions (*id.* ¶¶ 121–25); (iv) in August 2023, Benoit forwarded an email about the WFH policy directly to Plaintiff as well as a group distribution list that included Plaintiff (*id.* ¶¶ 197–198); and (v) in September 2023, Benoit "yelled" at Plaintiff in giving her a directive (*id.* ¶¶ 194–96).

Read in the light most favorable to Plaintiff, and considering the low burden at the dismissal stage, these factors weigh in favor of a plausible inference of discriminatory intent. "To

determine whether a particular comment is probative of discriminatory animus or is a mere 'stray remark,' a court considers: '(1) who made the remark, *i.e.*, a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark; and (4) the context in which the remark was made, *i.e.*, whether it was related to the decisionmaking process." *Luka v. Bard Coll*., 263 F. Supp. 3d 478, 487 (S.D.N.Y. 2017) (cleaned up) (quoting *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 519 (S.D.N.Y. 2004)).

Taking the elements in turn, Defendant Benoit acted as Plaintiff's supervisor at the time she made the majority of the comments, and was the individual who terminated her employment. SAC ¶¶ 90, 223. As such, Benoit can plausibly be treated as the decisionmaker in her firing. And temporally, Defendant's Benoit comments at the April 2023 "performance review" and her March 2023 statement in a "disparaging tone" about Plaintiff needing indefinite accommodations occurred only a few months before her termination.

More importantly, the content of the remarks themselves can be interpreted as significant. For instance, Defendant Benoit asking, in a disparaging tone, whether Plaintiff needed an accommodation indefinitely implied she had an unfavorable perspective towards Plaintiff's accommodation, and by extension, the legitimacy of, or need for, the disability accommodation. Defendant Benoit publicly forwarding an email about Mizuho's work-from-home policies so as to single out Plaintiff could also be seen as further evidence of Benoit's hostility towards her accommodation (and, by extension, her disability).

Benoit's comments during the allegedly impromptu April 2023 performance review also support an inference of discriminatory intent. The SAC alleges that Plaintiff's April 2023 review meeting was scheduled the same day it occurred, that it only focused on the three months she

worked with Defendant Benoit, and that she was not given a written copy of her review, which was contrary to Mizuho's policy. SAC ¶¶ 119, 121, 131. And in that review, Defendant Benoit largely leveled criticisms that indirectly implicated Plaintiff's disabilities, like the manner and volume at which she spoke. *Id.* at ¶¶ 123, 124. Taken together in full context, the SAC supports an inference that the April 2023 review was not a pre-planned, balanced conversation designed to give Plaintiff constructive feedback, but rather a one-off designed to indirectly ridicule her for perceived shortcomings based on her disability. In totality, these allegations regarding Defendant Benoit's conduct are enough to satisfy Plaintiff's "minimal" burden at this stage. S*ee Dooley v. JetBlue Airways Corp*., 636 Fed. App'x 16, 21 (2d Cir. 2015) (summary order).

To be sure, "[t]he ADA does not prevent an employer from holding an employee accountable for poor job performance." *Jacobson v. Capital One Fin. Corp*., 2018 WL 6817064, at *16 (S.D.N.Y. Dec. 12, 2018). Indeed, even if a plaintiff's unacceptable job performance is caused by their disability, an employer may still "hold a disabled employee to legitimate performance expectations, as long as the employee has the same opportunity to succeed as nondisabled employees do." *Id.* But ultimately, Plaintiff's performance at Mizuho and the nature, tone, and specifics of her April 2023 review are factual questions to be probed and revealed in discovery, and so dismissal at the 12(b)(6) stage would be inappropriate.

Plaintiff's claimed interactions with Defendant Gatto, however, fail to demonstrate any discriminatory intent tied to her eventual termination. Plaintiff alleges that Gatto asked her if she came in "just for this" at a November 2022 (SAC ¶¶ 76, 79) and December 2022 event (*id.* ¶¶ 91–93), and stated "glad you're okay to come for lunch." *Id.* ¶ 79. But any comments Gatto made at those events cannot evince any discriminatory intent. Plaintiff admits she informed Gatto of her disability only in April 2023 (SAC ¶¶ 138, 139) and does not allege Defendant

Gatto otherwise knew about her disability before that point. And as concluded above with respect to the FMLA retaliation claim, Plaintiff has not alleged any facts to support an inference that Gatto had a hand in her termination. In addition, as Plaintiff alleges, accommodation requests Mizuho received around that time were mostly COVID-related (*id.* ¶ 57), and the fact that Defendant Gatto, in both relevant instances, questioned whether Plaintiff was seeking an accommodation for her or someone else (*id.* ¶ 61) further suggests he had no knowledge of her disability.

Because Plaintiff has alleged sufficient facts, based on Defendant Benoit's conduct, to support an inference that her disability was a motivating factor in her termination, her discrimination claim under the ADA against Mizuho survives dismissal.

### B. Plaintiff Has Stated a Claim for Disability Discrimination Under the NYSHRL & NYCHRL Against Mizuho and Benoit

In contrast to a claim for disability discrimination under the ADA, discrimination claims brought under the NYCHRL are subject to a more liberal standard. Under the NYCHRL, a plaintiff must only plead "differential treatment of any degree based on a discriminatory motive; the NYCHRL does not require either materially adverse employment actions or severe and pervasive conduct." *Gorokhovsky v. New York City Hous. Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014) (summary order) (internal citation and quotation marks omitted). Claims under the NYCHRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Gonzalez v. City of New York*, 377 F. Supp. 3d 273, 299 (S.D.N.Y. 2019) (internal citation omitted). A plaintiff alleging discrimination under the NYCHRL "need only demonstrate by a preponderance of the evidence that [she] has been treated less well than other employees because of [her disability]." *Leftridge v. New York City Dep't of Educ.*, No. 17-CV-7027 (WHP), 2020 WL 1503665, at *12 (S.D.N.Y. Mar. 30, 2020). And with

respect to NYSHRL claims, while they historically followed the analysis employed by analogous federal statutes, as of August 12, 2019, the standard for discrimination claims under the NYSHRL is now comparable to the liberal standard of the NYCHRL. *de Souza v. Planned Parenthood Fed'n of Am., Inc*., No. 21-CV-5553 (LGS), 2023 WL 2691458, at *11 (S.D.N.Y. Mar. 29, 2023). As such, Plaintiff's NYSHRL claims in this case "rise and fall" with the NYCHRL claims, and will be treated identically. *Id.*

First, because the Court has found Plaintiff has stated a claim for disability discrimination under the ADA against Defendant Mizuho, she necessarily states a claim under the NYCHRL and NYSHRL against Defendant Mizuho. *See Gilani v. Deloitte LLP*, No. 23-CV-4755 (JMF), 2024 WL 4042256, at *6 (S.D.N.Y. Sept. 4, 2024) (permitting plaintiff's parallel claims of disability discrimination under NYSHRL and NYCHRL to "naturally" proceed where she plausibly stated a claim under the ADA).

Second, as to the Individual Defendants, unlike the ADA, they may be held liable pursuant to the NYCHRL and NYSHRL under aiding and abetting theories. "The same standards of analysis used to evaluate aiding and abetting claims under the NYSHRL apply to such claims under the NYCHRL because the language of the two laws is 'virtually identical.'" *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004) (citation omitted). Under both laws, an employee may be held liable for aiding and abetting a discriminatory or retaliatory act if he or she "actually participates in the conduct giving rise to a discrimination [or retaliation] claim." *Gilani*, 2024 WL 4042256, at *6 (citation omitted). The NYCHRL and NYSHRL provide for individual liability of an employee regardless of ownership or decisionmaking power. *Ahmad v. New York City Health & Hosps. Corp*., No. 20-CV-675 (PAE), 2021 WL 1225875, at *29 (S.D.N.Y. Mar. 31, 2021).

17

As concluded above, Defendant Benoit's remarks and conduct support an inference, at the pleading stage, of discriminatory intent with respect to Plaintiff's firing, and she can be held individually liable given she perpetrated the relevant conduct.

Defendant Gatto, however, cannot. As already determined, the SAC does not allege sufficient facts to support any inference that he played a role in Plaintiff's termination or the discriminatory conduct claimed here. Accordingly, the NYCHRL and NYSHRL claims are dismissed as to Defendant Gatto only.

### III.   Plaintiff States a Claim For a "Failure to Accommodate" under the ADA, NYCHRL, and NYSHRL Against Mizuho and Benoit

Plaintiff separately alleges disability discrimination by reference to a "failure to accommodate" based on Defendant Benoit's failure to extend her accommodation request in July 2023 when it was up for renewal. Plaintiff also argues that she would not have been able to fulfill a requisite of her role—lengthy work conversations—without her accommodation to work from home. Opp. at 13–14.

Discrimination in violation of the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 100 (2d Cir. 2009) (quoting 42 U.S.C. § 12112(b)(5)(A)). To make out a prima facie case of disability discrimination arising from a failure to accommodate, a plaintiff must show: "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Id*. at 96–97 (internal quotation marks and citation omitted). A claim of disability discrimination is analyzed similarly under the ADA, NYCHRL, and NYSHRL. *See*

*Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (same standard to maintain failure to accommodate claim under ADA and NYSHRL); *DiNome v. Cordis US Corp.*, No. 23-CV-11173 (ER), 2024 WL 3888799, at *8–9 (S.D.N.Y. Aug. 21, 2024) (observing that courts apply the same standard for failure to accommodate cases under the ADA, NYSHRL, and NYCHRL, but that the NYSHRL and NYCHRL use a broader definition of disability than does the ADA).

Defendants have only contested the third and fourth elements, and argue that Plaintiff has not pleaded facts sufficient to demonstrate she needed an accommodation, and that in any event, Mizuho permitted her to work remotely up until her termination and so at no point did they "fail to accommodate" Plaintiff's disability. Mem. at 15–17.

Plaintiff pleads facts sufficient to establish the third element: that her accommodation was required to enable her to perform an essential function of her job. Plaintiff alleges that, regarding her initial accommodation request, her oncologist recommended she work remotely to "adequately prepare her mouth for long conversations, spit as needed [,] and not have to contend with background noise." SAC ¶ 54. And in her opposition, Plaintiff argues the accommodation was necessary to perform a requirement of her role: namely, to "engage in work conversations" and to avoid Plaintiff having to "work full-time from Mizuho's women's restroom" where she would need to "brush her teeth and repeatedly rinse her mouth in order to be able to participate in the lengthy conversations the role required." Opp. at 13–14.

Defendants presumably concede, given their defense of Benoit's comments at the April 2023 review meeting, Mem. at 14, that Plaintiff has indeed identified an essential part of her job. And while Defendants may question whether Plaintiff's requested accommodation is the *most* reasonable or the *only* reasonable accommodation, a "[r]easonable accommodation may take

19

many forms," and so it is question best left to a factfinder. *Noll*, 787 F.3d at 95; *see Nakis v. Potter*, No. 01-CV-10047 (HBP), 2004 WL 2903718, at *15 (S.D.N.Y. Dec. 15, 2004) ("Whether a requested accommodation is reasonable depends on the specific circumstances of the case . . . ."). Here, Plaintiff has plausibly alleged, and explained, how working remotely enables her to perform her job responsibilities. One could imagine, for example, that being able to work remotely allows Plaintiff to avoid the embarrassment of inadvertently spitting on others, to speak into a microphone or other device to amplify her voice, and to quickly run to the bathroom to rinse her mouth rather than frequently walking out of conference room meetings. Again, Plaintiff carries only a minimal burden at the 12(b)(6) stage, but of course, Plaintiff will need to elicit discovery supporting her claims to avoid subsequent dismissal.

Plaintiff also narrowly satisfies her minimal burden as to the fourth element. She alleges that Defendant Benoit did not approve her accommodation renewal request in July 2023 (SAC ¶¶ 167–69), and that Unum advised she was placed into "inactive status." *Id.* While Defendants claim Plaintiff continued to work remotely and Mizuho never required her to come into the office (Mem. at 16) this does not itself mean there can be no discrimination given that Plaintiff was terminated not long after. "Terminating a disabled employee . . . who can perform the essential functions of the job but cannot return to work because the employer has denied [her] request for reasonable accommodation, is disability discrimination under the ADA." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 338 (2d Cir. 2000). A "[f]ailure to consider the possibility of reasonable accommodation for disabilities, *if it leads to discharge for performance inadequacies resulting from the disabilities*, amounts to a discharge solely because of the disabilities." *Id.* (cleaned up) (emphasis added) (citing *Borkowski v. Valley Cent. Sch. Dist.,* 63 F.3d 131, 143 (2d Cir. 1995)). The SAC has plausibly alleged Defendant Benoit (who ultimately fired Plaintiff) and

other members of Mizuho management made comments directed at Plaintiff's absence, implying it was being held against her. These allegations could raise a plausible inference that Defendant Benoit's non-renewal of her accommodation, and then termination, was the result of her (or Mizuho's) dissatisfaction with letting Plaintiff work remotely and their failure to accommodate her disability.

Accordingly, Plaintiff's claim for disability discrimination based on a failure to accommodate survives dismissal as to Mizuho and Benoit, but is dismissed as to Defendant Gatto because as discussed previously, the SAC does not allege Gatto had any role or involvement in approving Plaintiff's accommodation requests.

## IV. Plaintiff's Request for Leave to Amend the SAC is Denied

Plaintiff requests that if the Court "finds there to be any pleading deficiency capable of being cured" that Plaintiff be given leave to file another amended complaint. Opp. at 18. Defendants argue any such amendment would be futile, and that in any event Plaintiff makes no effort to show "good cause" given the request comes after the relevant deadline specified in the case management schedule. ECF No. 35 at 10. The Court denies Plaintiff's request.

Where a party has already amended a pleading once as of right, Rule 15(a) provides that a party may amend its pleading "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.*; *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (noting that Rule 15 sets forth a "liberal" standard). The "permissive standard" of Rule 15 "is consistent with our 'strong preference for resolving disputes on the merits.'" *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011) (quoting *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005)).

However, while "a plaintiff may amend a complaint after a scheduling order deadline . . . the plaintiff may do so only upon a showing of good cause." *Callahan v. Cnty. of Suffolk*, 96 F.4th 362, 370 (2d Cir. 2024). The operative scheduling order in this case required that amended pleadings be served on or before September 13, 2024. ECF No. 22 at 2. Plaintiff's "request" for leave first appeared in her opposition filed on September 23, 2024. Opp at 18. Plaintiff has made no attempt to argue or establish good cause for that delay.

Moreover, the record suggests that any such amendment would be futile as to the only dismissed claims of FMLA retaliation and aiding and abetting disability discrimination claim against Defendant Gatto. The arguments and issues raised in the instant motion to dismiss are largely identical to those raised in the Defendants' prior motion to dismiss. *Compare, e.g.,* Mem. at 20–22 *with* ECF No. 20 at 19 (making similar arguments regarding Plaintiff's FMLA retaliation claim as to Defendant Gatto). Plaintiff also has not indicated what, if any, facts she would add to a third amended complaint. Therefore, Plaintiff has "already had one opportunity to amend [her] complaint . . . [and] it is unlikely that the deficiencies raised with respect to the [SAC] were unforeseen," and so her request for leave is denied. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014).

## CONCLUSION

For the foregoing reasons, Defendants' partial motion to dismiss is GRANTED in part and DENIED in part, and Defendant Steven Gatto is DISMISSED from this case. The Clerk of Court is directed to terminate ECF No. 31.

Dated: March 27, 2025
      New York, New York

SO ORDERED.

*Jessica Clarke*

JESSICA G. L. CLARKE
United States District Judge

22